UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) CAUSE NO.: 2:20-CR-84 |
| | ) |
| DWYANE CRAWFORD, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter is before the court on a referral for a Report and Recommendation on the Motion to Suppress [DE 47] filed by the defendant, Dwyane Crawford, on December 6, 2021. A hearing was conducted on Monday March 24, 2022, and both the Government and the defendant presented evidence [DE 57]. For the reasons set forth below, it is **RECOMMENDED** that the Motion [DE 47] be **GRANTED**.

*Findings of Fact*

1. Alexander Reillo was hired as a patrolman by the Munster Police Department on March 6, 2017.

2. Officer Reillo is a certified K9 officer.

3. Officer Reillo currently is assigned to the Lake County Drug Interdiction Unit. His duties include patrolling interstate highways in Lake County in an effort to detect individuals who are trafficking drugs.

4. In addition to the standard training for a newly hired police officer, Officer Reillo has received additional training as a K9 officer and as a member of the Lake County drug unit.

5. Officer Reillo was on routine patrol on January 22, 2020. He was driving a marked

squad car which contained his K9 partner.

6. The squad car was equipped with a dash cam. An officer can manually activate the dash cam, but the dash cam automatically is activated when the officer turns on the emergency lights and siren.

7. The dash cam records events even when it has not been activated. However, these recordings were not saved until the dash cam is activated by the officer or by the emergency lights. Once the dash cam is activated, it saves the recording starting at 30 seconds before the activation.

8. Calumet Avenue is a major north/south highway that runs through Munster and into Hammond.

9. Ridge Road is a major east/west highway that also runs through Munster.

10. The intersection of Calumet Avenue and Ridge Road is controlled by a traffic light. Heading north on Calumet Avenue, there are two more traffic lights in Munster. The first one is at Broadmoor, and the second one controls traffic entering and exiting the Target shopping center.

11. Calumet Avenue, north of Broadmoor, is a five-lane highway. The center lane is a designated left turn lane because of all the businesses in that area.

12. The Little Calumet River marks the town limits of Munster.

13. After crossing the bridge into Hammond, there is a stop light at the intersection of Calumet Avenue and River Drive.

14. The area east of Calumet Avenue, on River Drive, is residential on the north side of the street with a park on the south side of the street.

15. On January 22, 2020, Robert Thompson was driving in a leased gray sedan. The defendant, Dwyane Crawford, was a passenger in the front seat, and Thompson's "Baby Mama," Vanessa Jeffries, was a passenger in the back seat.

16. Thompson was driving on a suspended license, and neither passenger had a valid drivers license.

17. Thompson had not rented the car, but he was driving it with the permission of the individual named in the lease. Because Thompson did not have a valid license, he was not an authorized driver under the terms of the lease.

18. Officer Reillo testified at the suppression hearing that on January 22, 2020, he was driving southbound in the 8000 block of Calumet Avenue. After he saw a gray sedan heading northbound make two unsafe lane changes, he decided to follow the vehicle.

19. Officer Reillo testified that he made a U-turn without activating his emergency lights. As such, neither the unsafe lane changes nor the U-turn were preserved by the dash cam recording system.

20. When Officer Reillo positioned himself several cars behind the gray sedan, he activated his emergency lights. The dash cam then recorded the previous 30 seconds and the remainder of the events at issue.

21. Northbound traffic was slowing as cars were leaving Munster and approaching the stoplight in Hammond and the entrance ramps to the Borman expressway.

22. One car was in the right lane and slowing down for traffic. Although the interval between this car and the one in front of it cannot be determined accurately from the video, it appears that the driver was two or three car lengths behind the car in front of

3

him.

23. Without signaling, the gray sedan moved from the left lane and into this two or three car interval. The driver "cut off" by this maneuver neither slowed nor made a sudden stop due to the unannounced lane change.

24. By the time Officer Reillo positioned himself directly behind the gray sedan, it had stopped for the traffic light at River Drive. The gray sedan turned right onto River Drive after Officer Reillo sounded his horn.

25. The dash cam shows Officer Reillo approaching the passenger side of the gray sedan. The video records the time as 4:16 p.m.

26. Officer Reillo was not wearing a body cam, so the conversations with Thompson, Crawford, and Jeffries were not recorded.

27. Thompson did not testify at the suppression hearing, but Crawford did. It is undisputed that Thompson had a suspended license, neither passenger had a valid license, and Crawford gave Officer Reillo an I.D. bearing the name of his brother, Shannon Crawford.

28. With no licensed driver to drive away from the scene, Officer Reillo had the right to have the vehicle towed.

29. Standard procedure requires an inventory of the items in the car before it is towed. However, the occupants would have been entitled to remove any personal belongings from the vehicle. Crawford could have removed his duffle bag from the trunk, and it would not have been subjected to an inventory search.

30. Because Officer Reillo had stopped the gray sedan for a traffic offense and Thompson

did not have a valid license, Officer Reillo asked Thompson to return to the squad car with him.

31. At 4:18 p.m., the video shows Officer Reillo conducting a pat down of Thompson outside of the gray sedan. With no recording or testimony from Thompson, the testimony of Officer Reillo that Thompson consented to the pat down must be accepted.

32. Because the K9 was in the rear seat, Thompson sat in the front seat of the squad car. The video records the conversation between Officer Reillo and Thompson starting at 4:19 p.m.

33. Officer Reillo testified that he entered the information on Thompson into the computer to determine the status of his license and whether there were any outstanding warrants.

34. While Officer Reillo was running the background check on Thompson, he asked Thompson if he ever had been in any "trouble." Thompson admitted to a prior drug conviction in 2008.

35. As previously stated, Crawford produced an I.D. for Shannon Crawford. When Officer Reillo asked Thompson who the passengers were, Thompson provided the name of Dwyane Crawford, his cousin. This information was provided at 4:20 p.m.

36. A computer check revealed an outstanding warrant for Crawford. When he testified at the suppression hearing, Crawford acknowledged that he was using his brother's I.D. because of the outstanding warrant.

37. There was only a brief exchange between Officer Reillo and Thompson concerning

5

the improper lane change. This occurred at 4:25 p.m.

38. At 4:26 p.m., Officer Reillo asked Thompson for permission to search the gray sedan. He never advised Thompson that he had the right to refuse the consent, and Thompson consented without any further prompting.

39. Officer Reillo asked Thompson whether there were any drugs in the vehicle, and he said that there were none.

40. Officer Reillo testified that he smelled marijuana on Thompson during the pat down, and in response to the question about drugs, Thompson admitted to smoking marijuana earlier in the day.

41. The video shows Officer Reillo leaving the squad to conduct the search at 4:27 p.m. Once again, the conversations with Crawford and Jeffries were not recorded.

42. Officer Reillo testified that Crawford initially questioned why he was asked to step out of the car but complied when he was told that Thompson had consented to the search. Both passengers sat on the curb while Officer Reillo searched the vehicle.

43. When Officer Reillo opened the trunk, he found a duffle bag. He asked the passengers whether it belonged to either one of them, and both denied ownership. Again, this conversation was not recorded.

44. Officer Reillo testified that he detected the odor of marijuana coming from the bag. A search of the bag revealed correspondence addressed to Crawford, a pill bottle with Crawford's name on it, and a loaded handgun. The pill bottle contained marijuana residue.

45. A computer search had revealed an outstanding warrant for Crawford. Officer Reillo

arrested Crawford on the warrant and for being a convicted felon in possession of a handgun.

46. Officer Reillo testified that he makes about 2500 traffic stops per year and that the average traffic stop takes about 10 to 15 minutes.

47. This traffic stop was not routine. The driver of the vehicle did not have a valid drivers license, and neither did the two passengers. It was a rented vehicle, but the driver did not have a copy of the lease agreement, and the named lessee was not in the vehicle. Finally, Thompson claimed that he had permission to drive the vehicle, but he could not have been an approved driver on the lease without a valid license.

48. Other issues arose which gave Officer Reillo reasons to expand the scope of the original traffic stop. He detected the odor of marijuana on Thompson during the pat down, and Thompson later admitted that he had smoked marijuana earlier in the day. Additionally, Crawford had given Officer Reillo an I.D. with the first name "Shannon," but Thompson told him that his cousin's first name was "Dwyane." Providing a false I.D. is a violation of **IND. CODE § 35-43-5-2.5**.

49. The dash cam video shows that the stop occurred at 4:16 p.m. and that the search was completed at 5:00 p.m., a total of 44 minutes. Under all of the circumstances, the duration of the stop was reasonable.

50. Crawford testified that they stopped at a liquor store in Lansing and that they were headed for the Hammond casino when they were stopped by Officer Reillo. He testified that Thompson turned left on Calumet Avenue and that they planned on getting on the expressway in Hammond.

51. In the two police reports made by Officer Reillo, Thompson is reported as saying that they were headed to Marshalltown, a section of Gary. (Defendant's Ex.s G & H). The video confirms the accuracy of the report.

52. Crawford testified that Thompson was in the right lane the entire time they were on Calumet Avenue except for one occasion when Thompson briefly moved into the left lane because someone was turning right into the shopping mall.

53. The dash cam video never showed the gray sedan in the right lane until it merged without signaling, the stated reason for the traffic stop. As such, the testimony of Crawford is suspect.

54. Crawford further testified that he first saw Officer Reillo in the Arnie's Parking lot waiting for traffic to clear. Arnie's is located at 8125 Calumet Avenue. Crawford said that he made eye contact with Officer Reillo and then watched him in the rear-view mirror. According to Crawford, both he and Thompson noticed that Officer Reillo had pulled out of the parking lot to follow them.

55. Officer Reillo denied that he was parked at Arnie's at any time before the traffic stop. He could not remember exactly where he made the U-turn and conceded that he may have used the Arnie's parking lot.

56. The testimony of Officer Reillo and Crawford cannot be reconciled. If Officer Reillo had used the parking lot to make the U-turn, Thompson and Crawford would have passed Arnie's before the squad car was in the parking lot. This factual dispute requires a credibility determination.

57. Officer Reillo made an incident report on January 23, 2020. (Defendant's Ex. G). In

that report, he stated that the northbound gray sedan made "several unsafe lane changes" in the 8000 block of Calumet Avenue. This is in the vicinity of the Target store. Officer Reillo did not mention that he was heading southbound and had to make a U-turn.

58. On January 27, 2020, Officer Reillo made a second incident report. (Defendant's Ex. H). Once again, he indicated that the northbound gray sedan made "several unsafe lane changes." Like the first incident report, he failed to state that he was travelling southbound and made a U-turn.

59. In his testimony at the hearing, Officer Reillo was unsure of where he executed the U-turn. However, he made a U-turn in heavy traffic and without the emergency lights and siren.

60. Arnie's is south of the Broadmoor intersection. If Officer Reillo used the parking lot for the U-turn, he would have crossed the busy intersection twice without the benefit of his lights and siren.

61. Crawford has felony convictions for bank robbery and distribution of marijuana. At the time of his arrest, he was carrying his brother's I.D. because he knew about the outstanding warrant. Crawford also denied ownership of the duffle bag during the search.

62. Most importantly, Crawford was asked at the hearing whether he had smoked marijuana that day. Crawford denied smoking marijuana that day, even though the pill bottle contained marijuana residue, and stated that he had smoked marijuana only once in his life, at age 15. In the pre-bond report, prepared on October 23, 2020,

Crawford stated that he had smoked marijuana once at age 16 and once at age 32. He is 49 years old.

63. Officer Reillo testified that the speed limit for that section of Calumet Avenue was 35mph, but no testimony was given concerning the speed of the gray sedan or the squad car during the events in question. Given the heavy traffic during that time of day and the businesses on both sides of the street, traffic may not have been travelling the posted speed limit.

64. Assuming that Officer Reillo and the gray sedan were driving 30mph when Officer Reillo observed the unsafe lane changes, the closing speed would have been 60 mph or approximately 90 feet per second. That would have required the gray sedan to have made multiple lane changes in a matter of seconds. If the speeds were faster, the observation time would have been even shorter.

65. Once again, no testimony was offered on whether Officer Reillo saw the occupants of the gray sedan as it passed him. If he was watching it carefully due to its erratic driving, it is logical to assume that he noticed two Black males in the front seat. This would have been consistent with Crawford's testimony that he made eye contact with Officer Reillo as they passed him in the Arnie's parking lot.

66. Both the testimony of Officer Reillo and that of Crawford are problematic. Officer Reillo never reported driving southbound on Calumet Avenue when he first saw the gray sedan. Making a U-turn in heavy traffic without emergency lights or siren would have made it difficult for Officer Reillo to position himself behind that vehicle as first depicted by the dash cam. This is especially true if Officer Reillo crossed

Broadmoor twice to use the Arnie's parking lot for the U-turn.

67. Besides being a convicted felon, Crawford produced a fake I.D. at the scene. More importantly, he denied using marijuana since age 15, despite the pill bottle bearing his name containing marijuana residue and his statements in his pretrial pond report.

68. The Government bears the burden of proving the legality of the search. Because the evidence is in equipoise, the Government has failed to meet its burden.

*Discussion*

When a search is challenged, the Government bears the burden of proving the validity of the search. **United States v. Hartsell**, 432 F.Supp.3d 805, 815 (N.D. Ind. Jan. 7, 2020) (*citing* **United States v. Peters**, 743 F.3d 1113, 1116 (7th Cir. 2014) (finding that "when a warrantless search or seizure has occurred, the [G]overnment bears the burden of proving compliance with the Fourth Amendment by a preponderance of evidence"). Even if a traffic stop is otherwise valid, the resulting detention is unconstitutional if the stop was motivated by race. **Conley v. United States**, 5 F.4th 781, 788 (7th Cir. 2021) (*citing* **Whren v. United States**, 517 U.S. 806, 813 (1996) (holding that "the Constitution prohibits selective enforcement of the law based on considerations such as race …").

The testimony of Officer Reillo at the suppression hearing was inconsistent with his two incident reports. Given the heavy traffic depicted in the video, it would have been very difficult for him to make a U-turn without his emergency lights and to get close enough to the sedan to capture the lane change on video. Additionally, the lane change, a technical violation of the statue, was made as traffic was slowing and did not endanger the driver who was "cut off." The conduct depicted in the video raises doubts concerning the true motivation for the stop.

11

The testimony of Crawford lacks credibility in several respects. However, his testimony, that Officer Reillo was parked in the Arnie's parking lot, does not have to be accepted. If Officer Reillo was watching the gray sedan as closely as he claims, he would have noticed Thompson and Crawford, two Black males in the front seat. The Government has failed to prove that the traffic stop was not racially motivated.

If the traffic stop was improper, the validity of the consent must be evaluated. *United States v. Ahmed*, 21 F.4th 475, 478 (7th Cir. 2021); *United States v. Cellitti*, 387 F.3d 618, 622-23 (7th Cir. 2004). Because the consent given by Thompson was part of the ongoing questioning, it was tainted by the original stop and therefore not voluntary.

Because this is a recommendation to the district judge, the other issues raised in the motion to suppress will be discussed in the interest of completeness.

A detention for a traffic stop, however brief, comes within the scope of the Fourth Amendment. In *Rodriguez v. United States*, 135 S.Ct. 1609 (2015), the Supreme Court compared a traffic stop to a *Terry* stop. The length of the stop must be determined by the "mission" of investigating the traffic violation. *Rodriguez*, 135 S.Ct. at 1614. However, the investigation and detention may be prolonged if the officer has a reasonable suspicion of other criminal activity. *Rodriguez*, 135 S.Ct. at 1616; *see also* *United States v. Ambriz-Villa*, __F.4th__ ; 2022 WL 765844, at *1 (7th Cir. 2022); *United States v. Cole*, 21 F.4th 421, 427-28 (7th Cir. 2021).

Officer Reillo stopped a vehicle occupied by three individuals who did not have valid drivers' licenses. The vehicle was leased, and the named lessee was not in the vehicle. Finally, one of the passengers, Crawford, gave Officer Reillo a false I.D. Under all of the circumstances,

the length of the detention before the consent was given was reasonable. In the first instance, it was related to the "mission" of the traffic stop. Secondly, specific facts relating to Thompson and Crawford justified extending the stop beyond the "mission."

Assuming there was a problem with the consent given by Thompson, Crawford has another obstacle to overcome. Both Crawford and Jeffries denied ownership of the duffle bag after Officer Reillo opened the trunk. By denying ownership, Crawford abandoned the bag and any privacy interest in it. **United States v. McDonald**, 100 F.3d 1320, 1328 (7th Cir. 1996); **Bond v. United States**, 77 F.3d 1009, 1013 (7th Cir. 1996).

*Conclusions of Law*

1. On January 22, 2020, Officer Reillo stopped a vehicle in which Crawford was a passenger.
2. The dash cam video shows that the vehicle made a lane change without using a turn signal. Under the circumstances, this was a highly technical violation of the law, which did not endanger any other vehicles.
3. The Government has not met its burden of proving that the traffic stop was not racially motivated.
4. The consent of the search given by Thompson was tainted by the original stop and not voluntary.
5. Because the original stop was tainted and the consent was not voluntary, Crawford has standing to challenge the illegal search of his duffle bag.

Based on the foregoing reasons, the court **RECOMMENDS** that the Motion to Suppress [DE 47] be **GRANTED.**

Pursuant to 28 U.S.C. §636(b)(1), the parties shall have fourteen days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. ***Willis v. Caterpillar, Incorporated***, 199 F.3d 902, 904 (7th Cir. 1999); ***Johnson v. Zema Systems Corporation***, 170 F.3d 734, 739 (7th Cir. 1999); ***Hunger v. Leininger***, 15 F.3d 664, 668 (7th Cir. 1994); ***The Provident Bank v. Manor Steel Corporation***, 882 F.2d 258, 260-61 (7th Cir. 1989); ***United States v. Johnson***, 859 F.2d 1289, 1294 (7th Cir. 1988); ***Lebovitz v. Miller***, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

ENTERED this 30th day of March, 2022.

/s/ Andrew P. Rodovich  
United States Magistrate Judge